# IN THE COURT OF APPEALS OF IOWA

No. 22-1477
Filed May 10, 2023

**IN THE INTEREST OF J.F.,**
**Minor Child,**

**A.F., Father,**
     Respondent-Appellant,

**C.W., Mother,**
     Petitioner-Appellee.
_____

Appeal from the Iowa District Court for Madison County, Kevin A. Parker,

District Associate Judge.


A father appeals the termination of his parental rights.  **AFFIRMED.**


Tara M. Elcock of The Law Shop by Skogerson McGinn, Van Meter, for

appellant father.

Ashley M. Sparks of Sparks Law, PLLC, Des Moines, for appellee mother.

Kelsey Lynn Knight, Des Moines, attorney and guardian ad litem for minor

child.


Considered by Vaitheswaran, P.J., and Greer and Chicchelly, JJ.

**VAITHESWARAN, Presiding Judge.**

A mother of a child born in 2011 filed a petition to terminate the father's parental rights, alleging he abandoned the child. *See* Iowa Code § 600A.8(3) (2021). The district court granted the petition. On appeal, the father contends (1) the mother failed to prove abandonment and (2) termination of his parental rights was not in the child's best interests.

"To abandon a minor child" means to "reject[ ] the duties imposed by the parent-child relationship, . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." *Id.* § 600A.2(20). A parent of a child who is six months or older

> is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

*Id.* § 600A.8(3)(b).

The father contends, "at no time did [his] conduct indicate that he intended to abandon [the child]." But "[t]he subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of acts specified in paragraph

. . . 'b' manifesting such intent, does not preclude a determination that the parent has abandoned the child." *Id.* § 600A.8(3)(c). Those acts are largely absent.

According to the mother, the father provided "[n]othing in the way of financial support . . . [n]ot even a Christmas present." He never sent birthday gifts and sent a single birthday card in 2021, which "went in the garbage."

The father agreed he never paid child support. *See In re B.H.A.*, 938 N.W.2d 227, 234 (Iowa 2020) (stating a father has an obligation to support a child until termination of his parental rights "with or without a support order"). And while he disputed the mother's testimony that he did not give the child anything, he could only point to purchases of "several outfits" and diapers as well as family health insurance coverage for two brief periods. *See id.* (noting father's failure to provide financial support and his "total contribution of approximately $400" during a twenty-month period).

The father's communication with the child also was minimal. Following the child's birth, the mother testified the father actively lived with the child for "nine, ten months." After the parents' relationship ended in 2012, the father did not see the child for approximately five years. While he was incarcerated for the latter part of those years, he only made contact with the child "four times" in about "a two-month span" following his release in 2017.

The father returned to prison in 2019. He remained incarcerated at the time of the termination hearing in April 2022. Although he hoped to be released on parole later in 2022, he admitted that was not a certainty and agreed his tentative discharge date was in 2041.

The father contends the mother was at least partially responsible for his failure to maintain a relationship with the child. The evidence on this point is mixed. The mother acknowledged destroying the birthday card he sent in 2021, but testified she otherwise did not interfere with the father's ability to have contact with the child. She stated the father had the child's cell phone number and she did not block his calls to that number or her own. The father, in contrast, testified he tried to maintain a relationship by calling while he was in prison, but his calls were refused. These calls, however, appear to have been made shortly before the card was sent in 2021. The same is true of another letter that was "returned to sender." There is scant indication that the father made the same effort in 2019 and 2020.

The father's actions were too little too late. *See In re K.L.*, No. 22-1037, 2023 WL 2396366, at *2–3 (Iowa Ct. App. Mar. 8, 2023) (noting the father had not seen the child for years largely due to his incarceration, failed to send cards, letters, or gifts, and did not contact the mother through Facebook). On our de novo review, we agree with the district court that the father failed to maintain substantial and continuous or repeated contact with the child as described in any of the paragraphs set forth in section 600A.8(3)(b)(1)–(3). *Cf. In re R.G.*, No. 21-1744, 2022 WL 2160691, at *4 (Iowa Ct. App. June 15, 2022) ("Even when [the father] was incarcerated, he acted to remain part of [the] child's life. [He] wrote letters, made phone calls, asked for visitation, and sought updates . . . .").

Termination must also be in the child's the best interests. *See* Iowa Code § 600A.1(1). First, the father argues termination was not in the child's best interests for the reasons cited above, reasons we have found unpersuasive. Second, he contends he was "actively working to address" his substance abuse.

Indeed, the father testified he "participated in multiple treatments" while in prison and had been "clean for almost four years." But his period of sobriety coincided with his period of incarceration. Following his prior release, the father admitted he returned to drug use. Third, the father points to his extensive family support. But if his past release is a template, his mother testified she did not see much of him. While she testified he had since "grown up," her minimal contacts with him or with the child diluted her opinion about the child's best interests. Finally, the father argues the child, who the mother identified as "African-American" like his father, "needed to maintain a tie with his heritage," as recommended by the child's therapist. The guardian ad litem was persuaded by this argument. She cited the therapist's concern that termination of the father's parental rights "would be like terminating a part of [the child]'s culture." At the same time, she stated the child did not share a bond with the father.

The absence of a bond minimized the father's ability to strengthen the child's cultural ties. More to the point, the mother disagreed that the child's "African-American heritage or race" was "being pushed to the side." She explained that she had "a lot of friends" who were "African-American that [were] very big supporters in [the child's] life." She also pointed to her efforts to address "some issues with kids that would make racist jokes" and would "pick[ ] on" the child "for being in the talented and gifted program." Specifically, she spoke to the school superintendent and principal and initiated therapy for the child, choosing a therapist who came "from the same background and could kind of help him through those areas." After a year of weekly sessions, she said the therapist initiated a slow-down. The mother also saw an improvement in the child's degree of anxiety.

The school counselor continued to check in with the child and, according to the mother, the school issues "pretty much" resolved themselves.  On our de novo review, we are not persuaded this issue warrants denial of the termination petition.

We affirm the termination of the father's parental rights to the child.

**AFFIRMED.**